UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

MARQUETTE BANK,                    )
                                   )
              Plaintiff,           )
                                   )
      vs.                          )        4:14-cv-00034-SEB-TAB
                                   )
DEBRA JO BROWN,                    )
*et al.*                           )
              Defendants.          )

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS**

This cause is before the Court on separate motions to dismiss filed on August 6, 2014 by

Defendants Debra Jo Brown, Melinda Gabbard, Brenda R. Lee, John D. Gay, and Ruthy Large[1]

[Docket No. 27] and by Defendants Michael Collier and Meegan Collier[2] [Docket No. 29]. For

the reasons set forth below, the motions are GRANTED in part and DENIED in part.

**Factual Background**

Plaintiff Marquette Bank ("Marquette") is an Illinois bank association headquartered in

Orland Park, Illinois. Defendants are family members, employees, or agents of Lester Lee, a

citizen of Indiana who at the time controlled a number of business entities, most notably Lees

Inns of America, Inc. ("Lees Inns"), which was a regional chain of motels.[3] Other related

entities—all alleged to have been controlled by Lester Lee at the time of the events described in

the Amended Complaint—were Hotel Capital Partners, LLC ("HCP"); the Lee Group Holding

Company, LLC ("the Lee Group"); Lee Holding, Inc.; Lees Inns Investment Management

---

[1] We refer to this group of Defendants as the "Lee Defendants" throughout this order, even though Gay and Large are not family members.

[2] We refer to this group of Defendants as the "Collier Defendants."

[3] Lester Lee himself, who is party to a bankruptcy proceeding in the Southern District of Indiana, is not a Defendant in this suit.

Corporation; and Kankakee Motel Associates, L.P. ("Kankakee").[4] These entities shared a headquarters, office space, and many of the same personnel, including the Defendants named in the complaint. Defendants Debra Brown, Melinda Gabbard, and Meegan Collier are all daughters of Lester Lee; all three served on the board of directors of Lees Inns and as members of the Lee Group. Defendant Brenda Lee is Lester Lee's wife; she, too, served as a director of Lees Inns and a member of the Lee Group. Defendant Michael Collier is Lester Lee's son-in-law (and Meegan Collier's husband); he was the president of HCP and was allegedly in charge of the day-to-day management of a number of Lester Lee's related entities, including Kankakee. Defendant John Gay, an attorney, served as counsel to all of the Lee entities, with his office in-house, and was paid for his work by Lees Inns Management Corporation, a Lees Inns subsidiary.[5] Lastly, Defendant Ruthy Large was an employee of the Lee Group, and also worked for the other related entities; according to Plaintiff, Large's title with HCP was "loan manager," and "[h]er responsibilities included making sure financial reporting requirements were met for mortgages and loan applications and to field questions loan officers might have regarding loans." Am. Compl. ¶ 9.

Marquette's allegations focus primarily on two intertwined transactions undertaken by Kankakee, a limited partnership whose sole general partner was Lees Inns—and was thus allegedly controlled by Lester Lee, acting through the Lees Inns board composed entirely of his wife and daughters.

The first transaction was an agreement to sell the Kankakee Motel, a property owned by Kankakee in Bourbonnais, Illinois, to Youngevity Mineral Spa, LLC ("Youngevity"). Kankakee

---

[4] The Amended Complaint states that some of these entities having been dissolved. We therefore refer to them in the past tense, though we are not aware of their current status.
[5] According to Plaintiff, Gay was therefore counsel to more than 30 business entities affiliated with Lester Lee, including Lees Inns, HCP, the Lee Group, Kankakee, and Lee Holding, Inc. Am. Compl. ¶ 8.

and Youngevity signed a Purchase and Sale Agreement and Land Sale Contract (the "Land Contract") on October 31, 2007. *See* Pl.'s Ex. 8. The Land Contract contained the following language regarding Youngevity's down payment for the Kankakee Motel:

> Down Payment. The Deposit to be paid by delivery of an executed Option to Purchase a certain tract of real estate located at 66 Soto Land [sic],[6] Grand Cayman Islands, consisting of approximately 6 acres and the improvements thereon, with consideration of such option being valued at One Dollar U.S. ($1.00). Said Option may be executed at any time within five (5) years.

Pl.'s Ex. 8 at § 2(D)(1).[7] The Land Contract called for the balance of the price, $4.2 million, to be paid in monthly installments. Despite this contract language, however, Plaintiff alleges that the Option never passed to Kankakee. Instead, in a separate contract signed the same day, Youngevity's principal, Joel Wallach, leased the same Cayman Islands property to a different entity controlled by Lester Lee—the Lee Group. *See* Pl.'s Ex. 10.[8] The lease contained a five-year option to purchase (the "Option") that could be exercised for $1, and it was signed by Wallach and Lester Lee. *Id.* at 5–6. Several months later, on March 1, 2008, the Lee Group, for consideration of one dollar, assigned this lease and Option to Lester Lee personally; Lester Lee signed the document memorializing the assignment in his capacity as the "manager" of the Lee Group. Pl.'s Ex. 11. The members of the Lee Group—the same group of Lee's wife and daughters constituting the Lees Inns board—formally consented to the transfer. Pl.'s Ex. 12.[9] Plaintiff alleges that the Option was exercised shortly thereafter; as evidence, it attaches a

---

[6] The actual address of the property in question is apparently 66 Soto *Lane.*

[7] As part of the discovery process in the adversary action Marquette brought against him in Bankruptcy Court, Lester Lee produced a document that he insisted was the final amended version of the Land Contract. This version deletes mention of the Option, and calls instead for a down payment of only $1. Plaintiff vehemently disputes the validity of this document, which it has attached "for informational purposes only" as its Exhibit 16.

[8] Plaintiff alleges that Michael Collier, John Gay, and Lester Lee all wrongfully represented to Wallach that transferring the Option to the Lee Group rather than Kankakee—as the Land Contract had stipulated—was proper. Am. Compl ¶ 133.

[9] Lester Lee signed this "Members Consent" on March 1, 2008, the same day as the Assignment. Brenda Lee, Meegan Collier, Melinda Gabbard, and Debra Brown all signed five days later. Pl.'s Ex. 12.

Cayman Islands "transfer of land" document showing that Wallach sold the property at Soto Lane for consideration of $1.3 million on March 6, 2008. Pl.'s Ex. 13.[10]

The second transaction at issue is a loan from Marquette to Kankakee intended to facilitate the refinancing of the same Kankakee Motel property. Plaintiff asserts that Defendant Michael Collier was Kankakee's point person in negotiating the loan with Marquette, and that these negotiations began in October 2007 with a meeting in which Lester Lee and Michael Collier were present. During this meeting, Collier allegedly represented to Marquette officials that Youngevity had agreed in principle to buy the motel property for a total price of $5.9 million, with a down payment consisting of the Cayman Islands Option—valued at $1.3 million—and the balance to be paid monthly. Kankakee followed up by emailing Marquette a copy of the Land Contract on November 8, 2007. Pl.'s Ex. 9. On November 14, 2007, Marquette's Loan Committee approved the loan to Kankakee in the amount of $3.575 million. *See* Pl.'s Ex. 31. The approval was subject to an independent appraisal of the value of the Kankakee motel. In December 2007, the independent appraiser interviewed Michael Collier, who represented to him that the total consideration paid by Youngevity for the property in the Land Contract was "approximately $6 million," and that this price included the value of the Option for the Cayman Islands property which was "currently being marketed for an asking price of $1.75 million." *See* Pl.'s Ex. 32 at 6.

On February 6, 2008, the Marquette Loan Committee modified the terms of its approval, adjusting the maximum loan amount down to $3.5 million. The Committee's continued approval of the loan was allegedly based, at least in part, on a memorandum prepared by Marquette officer

---

[10] The "transfer of land" contract recites that the property is being sold to "SE CAR LTD," an entity that is not described elsewhere in the Amended Complaint. Plaintiff asserts that this was an account held in Lester Lee's name. Am. Compl. ¶ 105.

Mikal Christopherson, in which he stated that he was "comfortable" with the amount in question because of "[t]he conservative nature of the appraised value in relation to the contract sale price [i.e. the $5.9 million value quoted by Michael Collier]," and "[t]he personal financial strength of Lester Lee and his experience in the industry," among other factors. Pl.'s Ex. 33.[11] The next day, Marquette sent a Loan Agreement notifying Lee and his affiliated entities of the loan's modified approval; the Agreement stated that the deal was subject to several conditions or "covenants," including the following:

    a. The Borrower [Kankakee] represents and warrants that all financial statements and data submitted to the Bank [Marquette] are true and accurate and that no litigation is currently pending against the Borrower or the Guarantors which has not been disclosed to the Bank.

    b. The Borrower agrees to immediately notify the Bank in the event of any significant or material change in their financial structure, statements, or undertakings.

    c. Assignment of the sales contract between the owner of the borrower and Mr. Joel Wallach.

Pl.'s Ex. 5 at 3.

The board of Lees Inns—its general partner—having given its written consent to the loan, *see* Pl.'s Ex. 35, Kankakee on April 11, 2008 executed a promissory note evidencing indebtedness of $3.5 million for the loan which was to mature on April 10, 2013.[12] Pl.'s Ex. 1. On the same day, Kankakee executed an "Assignment of Contract," which included the following recitals:

    C. Secured Party [Marquette] requires as a condition precedent to its making the Loan that Borrower [Kankakee] enter into this Assignment and Borrower wishes

---

[11] Plaintiff asserts that Christopherson's judgment as to the "financial strength" of Lester Lee was based on the 2007 Financial Statement Lee submitted to Marquette, which Plaintiff characterizes as a "complete work of fiction and a fraud." Am. Compl. ¶¶ 48–56. We conclude that the Defendants in this action do not bear sufficient culpability for any misrepresentations contained in Lester Lee's personal financial statements for them to be directly relevant here.

[12] The Note itself recited that the Assignment executed on the same day (and described here below) served as security for the Note. Pl.'s Ex. 1 at ¶ 4.

to grant to Secured Party a security interest, mortgage, lien, encumbrance and charge upon the collateral more particularly hereinafter described.

D. Borrower has entered into Purchase & Sale Agreement and Land Sale Contract dated October 31, 2007 with Youngevity Mineral Spa, LLC, an Illinois limited liability company, as purchaser ("Land Sale Contract").

Pl.'s Ex. 18, at ¶¶ C, D. In light of these recitals, Kankakee stated in the Assignment that:

As further security for the payment of the Loan and performance of all Borrower obligations, Borrower hereby assigns, transfers, pledges, sets over and grants a security interest to Secured Party, in and to all of Borrower's right, title and interest in the Land Sale Contract, to all funds and monies deposited with Borrower or any of its affiliates or agents in connection with the Land Sale Contract, all extensions, renewals, modifications and substitutions therefor or thereof, and all proceeds thereof (all of which constitute the Pledged Collateral hereunder).

. . .

This Assignment creates, and Borrower hereby grants unto Secured Party, a security interest in the Pledged Collateral and the proceeds (cash and non-cash) thereof and all interest thereon, if any, and constitutes a security agreement from Borrower to Secured Party under the Uniform Commercial Code of the State of Illinois.

Pl.'s Ex. 18, at ¶¶ 1, 4. The Assignment further stated that Kankakee had no authority to enter into any modifications or amendments of the Land Contract, and that it would not "pledge, assign, or transfer or attempt to pledge, assign, or transfer the Pledged Collateral." *Id.* at ¶¶ 2, 7.

In connection with the promissory note and assignment agreement, Lee counsel John Gay sent Marquette an opinion letter on April 29, 2008, stating that he had reviewed the "loan documents"—including the April 11, 2008 assignment to Marquette and the Loan Agreement between Kankakee and Marquette.[13] Gay opined that, based on his review of the documents,

---

[13] The promissory note defines "Loan Documents" as including, among other documents, the April 11 assignment executed by Kankakee, the personal guaranty issued by Lester Lee, the loan agreement itself, and "any other document now or hereafter given to evidence or secure payment of this note and delivered to induce Lender to disburse the proceeds of the Loan, as such documents may hereafter be amended, restated, or replaced from time to time." Pl.'s Ex. 1 at ¶ 4.

Marquette had "all necessary legal right, power and authority to conduct its business and to enter into and perform its obligation under this Agreement and the Loan Documents." Pl.'s Ex. 6 at ¶ ii. He further represented that "the Loan Documents and this Agreement have been duly and validly executed and delivered, are enforceable in accordance with their respective terms (subject to bankruptcy laws and pertaining to the exercise of creditors' rights generally) and are subject to no defenses of any kind." *Id.* at ¶ v. Plaintiff alleges that these representations were intentionally false, because Gay knew as of April 2008 that the Cayman Islands property Option had been transferred to Lester Lee's personal possession, and thus could not be pledged by Kankakee as collateral as expressly contemplated in the Loan Agreement and the April 11, 2008 Assignment.[14]

Plaintiff alleges that neither Marquette's principal representative Christopherson nor any other Marquette official was aware at the time that the Cayman Islands property Option had been assigned to the Lee Group—and then to Lee himself—rather than to Marquette.[15] Lester Lee allegedly sold the Cayman Islands property in May 2008, reaping a profit of $1.2 million from the sale. Defendants assert that, later in May 2008, Kankakee and Youngevity cancelled the Land Contract and executed a mutual release.[16] Plaintiff disputes the authenticity of this release and insists that it could not have been effective, since Kankakee had never owned the Option—which had allegedly since been exercised by Lester Lee—and had no authority to cede it back to Youngevity.

---

[14] Lester Lee also made a personal guaranty of the promissory note. Am. Compl. ¶ 69.
[15] Plaintiff recounts that Ruthy Large inadvertently sent Christopherson an email containing information relevant to Lester Lee's interests in the Cayman Islands property, and then told him to "please disregard, I'm not sure how it happened or what it was, but by the subject it is not pertaining to this deal [i.e. the loan]." Am. Compl. ¶ 116.
[16] Plaintiff has attached this document to its Amended Complaint as Exhibit 17, though it disputes its authenticity and validity.

Pursuant to a court judgment in what Plaintiff alleges was a collusive suit, Lees Inns dissolved in August 2008 and transferred all of its assets to the Lee Group. Another judgment for approximately $7.5 million was entered against the Lee entities in resolution of a long-running dispute with extended-family shareholders under the Indiana dissenters' rights statute. *See* Pl.'s Ex. 25. Plaintiff alleges that in January 2009, Lester Lee "transferred all of his assets to his wife and children or to entities owned by them." Am. Compl. ¶ 214. Despite these developments, Plaintiff asserts that Lester Lee continued to provide financial statements to Marquette, pursuant to his obligations as loan guarantor, that significantly overstated his financial solvency. According to Plaintiff, these misrepresentations, which were knowingly aided by his attorney Gay, occurred through October 2009.

In July 2009, Kankakee became delinquent on its loan payments to Marquette, and it went into default in September 2009. Lester Lee, through Ruthy Large, told Marquette that the decrease in his personal net worth had been caused by recent "estate planning" activities, but neither Lee himself nor any of his agents disclosed the fate of the Cayman Islands Option or the money derived from its exercise and the subsequent sale of the property. Kankakee closed the Kankakee motel in January 2010, and, shortly thereafter, Marquette filed a foreclosure suit in Illinois state court. Judgment in that suit was entered in favor of Marquette for approximately $4 million. Plaintiff asserts that, as of March 28, 2013, Lester Lee still owes Marquette $2.597 million by virtue of his personal guaranty of the loan to Kankakee.

## Legal Analysis

### Standard of Review

**Under Rule 12(b)(6)**

The Federal Rules of Civil Procedure authorize dismissal of claims for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In determining the sufficiency of a claim, the court considers all allegations in the complaint to be true and draws such reasonable inferences as required in the plaintiff's favor. *Jacobs v. City of Chi.,* 215 F.3d 758, 765 (7th Cir. 2000). Federal Rules of Civil Procedure 8(a) applies, with several enumerated exceptions, to all civil claims, and it establishes a liberal pleading regime in which a plaintiff must provide only a "short and plain statement of the claim showing that [he] is entitled to relief," Fed. R. Civ. Pro. 8(a)(2); this reflects the modern policy judgment that claims should be "determined on their merits rather than through missteps in pleading." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 779 (7th Cir. 2007) (citing 2 James W. Moore, et al., *Moore's Federal Practice* § 8.04 (3d ed. 2006)). A pleading satisfies the core requirement of fairness to the defendant so long as it provides "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008).

In its decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Supreme Court introduced a more stringent formulation of the pleading requirements under Rule 8. In addition to providing fair notice to a defendant, the Court clarified that a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility requires more than labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). Instead, the factual allegations in the complaint "must be enough to raise a right to relief

above the speculative level." *Id.* The plausibility of a complaint depends upon the context in which the allegations are situated, and turns on more than the pleadings' level of factual specificity; the same factually sparse pleading could be fantastic and unrealistic in one setting and entirely plausible in another. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 370 (M.D. Pa. 2008).

Although *Twombly* and *Iqbal* represent a new gloss on the standards governing the sufficiency of pleadings, they do not overturn the fundamental principle of liberality embodied in Rule 8. As this Court has noted, "notice pleading is still all that is required, and 'a plaintiff still must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *United States v. City of Evansville*, 2011 WL 52467, at *1 (S.D. Ind. Jan. 8, 2011) (quoting *Tamayo*, 526 F.3d at 1083). On a motion to dismiss, "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994).

**Under Rule 9(b)**

Count I of the Amended Complaint sounds in fraud. To plead fraud or mistake under Rule 9(b), a plaintiff must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to plaintiff." *See* Fed. R. Civ. Pro. 9(b); *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992). The Seventh Circuit has summarized the particularity requirement as "calling for the first paragraph of any newspaper story: the who, what, when, where, and how." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (citations

omitted). The rules require that fraud allegations be stated with greater particularity in order to combat "the great harm to the reputation of a business firm or other enterprise" that can be inflicted by a baseless claim. *See Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). It is important to keep in mind that these heightened particularity requirements apply only to the circumstances of the alleged fraudulent representation; they do not impose a higher pleading standard as to the other elements of the plaintiff's claim. "Rule 9(b) applies to the specifics of alleged misrepresentations, but the notice pleading requirements of Rule 8 apply to other aspects of the plaintiff's complaint, such as damages, reliance, or a defendant's state of mind." *Ind. Bell Tel. Co. v. Ward,* 2002 WL 32067296, at *3 (S.D. Ind. Dec. 6, 2002). *See also Lachmund v. ADM Inv. Servs., Inc.*, 191 F.3d 777, 782–783 (7th Cir. 1999).

## Discussion

Plaintiff alleges that Defendants, in their capacities as Lee employees or directors of the Lee Group and Lees Inns, assisted Lester Lee in securing for Kankakee a loan under false premises—and then converting the value of the $1.3 Cayman Islands property Option that Marquette had been led to believe was secured by the loan. The Amended Complaint contains two counts: Count I alleges conspiracy to commit fraud and to fraudulently transfer assets, and Count II seeks recovery under the equitable theory of unjust enrichment. We address these common-law claims in turn, applying Indiana law.[17]

## I.    Count I

### A. Conspiracy liability

---

[17] Plaintiff and Defendants agree that Indiana law applies. Though many of the contracts at issue here state that they are to be governed according to Illinois law, this suit sounds in fraud rather than contract. In this diversity action, we apply Indiana choice of law principles. Indiana, in turn, states that tort suits are generally governed by the law of the state in which the alleged tortious actions occurred. *See Hubbard Mfg. Co., Inv. v. Greeson,* 515 N.E.2d 1071, 1073–1074 (Ind. 1987). The alleged tortious misrepresentations here occurred almost entirely in Indiana, where the various Lee entities were headquartered and all Defendants resided and worked. Under these circumstances, we agree with the parties that Indiana law governs.

On its face, Count I alleges that all the named Defendants engaged in a civil conspiracy to commit two underlying torts. Indiana law defines a civil conspiracy as "a combination of two or more persons who engage in a concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means." *K.M.K. v. A.K.*, 908 N.E.2d 658, 663 (Ind. Ct. App. 2009); *Boyle v. Anderson Fire Fighters Ass'n Local 1262, AFL-CIO*, 497 N.E.2d 1073, 1079 (Ind. Ct. App. 1986). In order to state a claim for a civil conspiracy, a plaintiff must therefore allege not only concerted action among defendants, but the commission of an underlying tort that resulted in damages. *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1168 (Ind. 2002).

We conclude that Plaintiff's conspiracy theory of liability is not viable here, for two reasons. First, the allegations against the Lee family Defendants—Debra Jo Brown, Melinda Gabbard, Brenda R. Lee, and Meegan Collier—do not plausibly describe concerted tortious action with the other Defendants. Second, the remaining Defendants were all agents of Lester Lee or the entities controlled by him—and thus cannot have "conspired" with him or each other as a matter of law.

Plaintiff's allegations against Lester Lee's wife and daughters, who constituted the Lees Inns board of directors and four of the five members of the Lee Group (along with Lester Lee himself), exclusively involve their votes to approve transactions engaged in by Kankakee or the Lee Group. The Lees Inns board, in its capacity as the sole general partner of Kankakee, approved the loan between Kankakee and Marquette. *See* Am. Compl. ¶ 64; Pl.'s Ex. 35. The same four Defendants, in their capacity as members of the Lee Group, also unanimously consented to the Lee Group's assignment of the Cayman Islands property Option from the Lee Group to Lester Lee. Am. Compl. ¶¶ 85–87. Plaintiff alleges that the four Lee family

Defendants had full knowledge of the terms of the loan when they approved it, and were therefore aware that the assignment of the Option contravened the representations made by Kankakee in connection with the loan. *Id.* at ¶ 63. But after-the-fact ratification of two business transactions that are inconsistent with each other, by itself, does not plausibly support an inference that the board members had the requisite intent to engage in fraudulent concerted action with the other Defendants. *Cf. Rosenbaum v. White,* 692 F.3d 593, 606 (7th Cir. 2012) (rejecting a conspiracy claim where "the plaintiffs have failed to demonstrate that the defendants acted in concert with [the principal co-defendant] to commit any unlawful act"). These board votes might give rise to a claim that the directors and members violated their fiduciary duty of care to Kankakee or the Lee Group, but we do not find that they are sufficient to implicate them in a conspiracy.

The remaining Defendants—Michael Collier, John Gay, and Ruthy Large—were all agents of Lester Lee.[18] Collier was the president of HCP and ran Lees Inns "on a day-to-day basis"; Plaintiff alleges that he "reported to, and worked with, Lester Lee." Am. Compl. ¶ 7. Gay "served as counsel to all companies and business entities operated, owned and/or controlled by Lester Lee." *Id.* at ¶ 8. Large "worked for HCP, State Mortgage Corp., and other entities operated, owned, and/or controlled by Lester Lee." *Id.* at ¶ 9. These individuals cannot have conspired with Lester Lee to effect Lee's fraudulent scheme because, as a matter of law, a principal cannot conspire with his own agents. *See Soft Water Utilities, Inc. v. LeFevre,* 308 N.E.2d 395, 399–400 (Ind. Ct. App. 1974) ("It is basic to the law of conspiracy that there must be at least two persons or entities to constitute a conspiracy. A corporation cannot conspire with an agent when that agent is acting within the scope of his authority."); *Jamerson v. Anderson*

---

[18] Plaintiff has alleged that all of the various "Lee entities" involved in this litigation were subject to the control of Lester Lee. *See generally* Am. Compl. ¶¶ 11–18.

*Newspapers, Inc.*, 469 N.E.2d 1243, 1252 (Ind. Ct. App. 1984), *overruled on other grounds by Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). *See also In re Settlers' Hous. Serv., Inc.*, 514 B.R. 258, 280 (Bankr. N.D. Ill. 2014) (affirming the general rule that "a principal cannot conspire with its own agents").

The conclusion that Count I does not state a claim for conspiracy does not necessarily mandate its wholesale dismissal, however. In Indiana, as Defendants have pointed out, "there is no separate civil cause of action for conspiracy." *Sims v. Beamer,* 757 N.E.2d 1021, 1026 (Ind. Ct. App. 2001). "Unlike criminal conspiracy, the gist of a civil conspiracy is not the unlawful agreement, but the damage resulting from that agreement. In other words, allegations of a civil conspiracy are just another way of asserting a concerted action in the commission of a tort." *K.M.K.*, 908 N.E.2d at 663 (citations omitted). In its essence, Count I asserts a theory of joint liability for fraudulent acts committed by certain Defendants; Plaintiff argues that it has "stated allegations to sufficiently support viable claims for fraud against Michael Collier, John Gay, and Ruthy Large, [and] conspiracy to commit fraud against all Defendants." Pl.'s Resp. 3.

The Federal Rules of Civil Procedure "reflect[] a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002)). We use "common sense to determine what relief the party desires," and we will not dismiss a count that sets forth a viable claim for relief simply because it has been mislabeled.[19] *See S.E.C. v. Elliott,* 953 F.2d 1560, 1582 (11th Cir. 1992); *Misco Leasing, Inc. v. Keller,* 490

---

[19] We are not concerned here that Defendants were not fairly put on notice of the nature of the claim. Both sets of Defendants devoted almost the entirety of their briefs to arguing the question of whether any of the individual Defendants engaged in fraud.

F.2d 545, 548 (10th Cir. 1974). We will therefore allow Count I to survive to the extent that Plaintiff has adequately pled a claim for fraud against any individual Defendant.[20]

## B. Fraud liability of individual Defendants

Count I incorporates specific fraud allegations against three Defendants: Michael Collier, John Gay, and Ruthy Large.[21] Fraud in Indiana is defined as "(1) a material representation of a past or existing fact by the party to be charged that; (2) was false; (3) was made with knowledge or reckless ignorance of its falsity; (4) was relied upon by the complaining party; and (5) proximately caused the complaining party's injury." *Ruse v. Bleeke,* 914 N.E.2d 1, 10 (Ind. Ct. App. 2009); *Youngblood v. Jefferson Cnty. Div. of Family & Children*, 838 N.E.2d 1164, 1169–1170 (Ind. Ct. App. 2005).

Although most formulations of the standard do not explicitly include such a requirement, "[a]n intent to deceive, or 'scienter,' is an element of actual fraud, whether classified as a knowing or reckless misrepresentation or as an additional element to a knowing or reckless misrepresentation." *Wright v. Pennamped,* 657 N.E.2d 1223, 1230 (Ind. Ct. App. 1995). *See also Francis v. AIT Labs.,* 2008 WL 4585423, at *5 (S.D. Ind. Oct. 14, 2008). A tortfeasor's state of mind, of course, can seldom be proven directly; evidence that a defendant knew, or should have known, that a representation would induce reliance is one of several factors that may be

---

[20] Count I also asserts that Defendants are liable for civil conspiracy to commit a fraudulent conveyance. Both sets of Defendants argue in their briefs that any claim for fraudulent conveyance fails because it is (1) barred by Indiana's applicable statute of limitations and (2) not properly before the Court as it is within the exclusive jurisdiction of the Bankruptcy Court before which actions involving Lester Lee are currently pending. Lee Defendants' Br. 19–22; Collier Defendants' Br. 26–30. Plaintiff has not responded to these arguments, and does not address the fraudulent conveyance claim in its Response brief. Plaintiff has therefore waived any such arguments and abandoned the fraudulent conveyance claim. *See Central States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999); *Perry v. City of Indianapolis,* 2013 WL 1750747, at *7 (S.D. Ind. Apr. 23, 2013).

[21] Although Plaintiff asserts generally that the Lee family Defendants bear responsibility for the other Defendants' (and Lester Lee's) fraud pursuant to its conspiracy theory of liability, the Amended Complaint contains no allegations that any of the four made any representations themselves that could give rise to fraud liability.

probative of *scienter. "*Proof of intent to deceive is determined by a review of all of the relevant factors of the particular case . . . . Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *In Re McGinnis,* 2010 WL 4956376, at *3 (Bankr. S.D. Ind. Nov. 30, 2010) (citing *Mayer v. Spanel Int'l, Ltd.*, 51 F.3d 670, 673 (7th Cir. 1995)).[22]

We address the allegations pertaining to each of these three Defendants in turn, and we conclude that Plaintiff has adequately stated a claim with respect to Michael Collier and John Gay.

### 1. Allegations against Michael Collier

Plaintiff's two most specific allegations against Collier concern his representations as to the value received by Kankakee in the Land Contract with Youngevity—particularly whether Kankakee actually received the Option as recited by that contract.

First, Plaintiff asserts that, at a meeting with Marquette on October 24, 2007 as part of the negotiation of the loan to Kankakee, Collier—alongside Lester Lee—represented to Marquette officer Christopherson that Youngevity had agreed to pay $5.9 million for the Kankakee motel. The way Collier allegedly described the deal, Youngevity's down payment would be the Option (represented as worth $1.3 million); the rest of the amount would consist of a $400,000 payment towards the motel's mortgage and $4.2 million in monthly payments over five years. Am. Compl. ¶¶ 30, 32. Regardless of the effect this statement may have had on Marquette, it cannot constitute fraud because it was made before the Land Contract and assignment of the Option to

---

[22] These cases involve the construction of a federal bankruptcy statute rather than Indiana law, but they derive the "intent to deceive" element of fraud from the common law. "The word 'fraud' implies a requirement of intent to deceive." *Mayer,* 51 F.3d at 674 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976); *Neal v. Clark,* 95 U.S. 704, 709 (1877)).

the Lee Group were consummated on October 31, 2007—in other words, it was not yet necessarily untrue. "Indiana law is well-settled that actual fraud 'may not be based on representations regarding future conduct, or on broken promises, unfulfilled predictions or statements of existing intent which are not executed.'" *Dunlap v. Switchboard Apparatus, Inc.,* 2012 WL 1712554, at *9 (S.D. Ind. May 15, 2012) (quoting *Biberstine v. N.Y. Blower Co.*, 625 N.E.2d 1308, 1315 (Ind. Ct. App. 1993)).

Plaintiff also alleges, however, that Collier made similar misrepresentations in December 2007 in an interview with the independent appraiser who was assessing the value of the Kankakee motel property pursuant to the loan agreement. Am. Compl. ¶ 41. The appraiser's subsequent memorandum to Marquette specifically noted the interview with Collier, and reflected Collier's statement that the total consideration paid by Youngevity for the property in the Land Contract was "approximately $6 million," and that this price included the value of the Option for the Cayman Islands property which was "currently being marketed for an asking price of $1.75 million." *See* Pl.'s Ex. 32 at 6. Plaintiff asserts that the Marquette Loan Committee relied upon Collier's statements in approving the modified loan in February 2008. Am. Compl. ¶ 45.

We conclude that the allegations regarding the December 2007 representation to the appraiser satisfy the Rule 9(b) fraud pleading requirements. Plaintiff has stated—within reasonably narrow bounds—when the misrepresentation occurred, who made it, and what its subject matter was. *See UniQuality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). This allegation is rendered plausible by the existence of a memorandum from the independent appraiser, attached to the Amended Complaint, reflecting that the interview with Collins did, in

fact, take place.[23] *See* Pl.'s Ex. 32 at 6. Moreover, Plaintiff has satisfactorily pled the elements of

a claim for actual fraud. By December 2007, the transactions described by Collier had already

occurred: Youngevity had executed the lease and Option to the Lee Group on October 31, 2007,

even though the Land Contract signed the same day recited that the Option would be provided to

Kankakee as a down payment for the motel property. The value of the collateral Kankakee would

be able to provide for the loan was plainly a material question to Marquette, and, unlike Collier's

October 24 statement, this later colloquy represented a "misrepresentation of *past or existing*

fact." *See Baehl v. Bank of America, N.A.*, 2013 WL 1319635, at *8 (S.D. Ind. Mar. 29, 2013)

(emphasis added).[24] Plaintiff plausibly alleges that Collier, as an executive officer of Lees Inns

and other Lee entities, was aware that his representations to the appraiser were false; Defendants

do not meaningfully dispute this imputation of knowledge.[25] *See* Am. Compl. ¶¶ 79, 81.

With respect to reliance, the Collier Defendants argue that Marquette cannot have relied

on Michael Collier's statements, because the appraiser ultimately set the Kankakee motel's value

at $5 million—less than Collier's $6 million incorporating the ostensible $1.3 million down

payment represented by the Option. In the hyperbolic style that unfortunately pervades the

Collier Defendants' brief, they state as follows: "Astoundingly, a close review of the Amended

Complaint discloses that the independent appraiser did not even rely on Michael Collier's

statements of value . . . . The contradictory nature of these allegations is puzzling and their

---

[23] To the extent that memorandum is offered for the truth of its contents at trial, it would likely be hearsay. Fed. R. Evid. 801(c). We do not concern ourselves with that question at this stage; the existence of the memorandum, not its veracity, lends plausibility to Plaintiff's allegation that an interview took place.
[24] The Collier Defendants insist that Collier's statements must be regarded as expressions of "opinion" or "the 'puffing' of a sales agent or broker." Collier Defs.' Br. 21, ¶ 31. We do not see how the December 2007 statement can be classified as opinion or puffery, given that he was purportedly describing a transaction that had already taken place rather than merely extolling the virtues of a property for sale.
[25] The Collier Defendants argue only that the allegations with regard to the first, second, and third elements of a fraud claim (material representation, falsity, and knowledge) are "vague, at best." Collier Defs.' Br. 9, ¶ 15. They primarily dispute the sufficiency of the allegations regarding intent to deceive and reliance. *Id.*

purpose is baffling, save perhaps to defame and cast obloquy and ridicule upon Michael Collier."

Collier Defs.' Br. 20, at ¶ 30. Defendants' protestations notwithstanding, Plaintiff's allegation of

reliance is sufficient at the motion to dismiss stage. The Amended Complaint states that the

appraiser relied upon Collier's statements, which were in turn relied upon by the Marquette Loan

Committee, whose approval of the loan in February 2008 noted that the $5 million value set by

the appraiser was "conservative" in light of the nearly $6 million ostensibly paid under the Land

Contract. *See* Am. Compl. ¶ 45; Pl.'s Ex. 33. Count I asserts that Marquette's grant of the loan in

reliance on these and other misrepresentations damaged it in the amount of more than $2.5

million. Am. Compl. ¶¶ 240, 247–248.

In urging dismissal, the Collier Defendants contend that Plaintiff has not adequately pled

that Collier acted with fraudulent intent, correctly noting that "there can be no fraud without a

representation made with intent to deceive." Collier Defs.' Br. 12, ¶ 22 (citing *B.E.L.T., Inc. v.

Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2004)). Intent, however, is a factual question, and it

may inferred from a defendant's knowledge and other circumstances. *See Wright v. Pennamped,*

657 N.E.2d 1223, 1230 (Ind. Ct. App. 1995). As we have already observed, *scienter*, while

indispensable to proving fraud, is not necessarily a formal pleading requirement under Indiana

law. *See Ruse v. Bleeke,* 914 N.E.2d 1, 10 (Ind. Ct. App. 2009) (enumerating elements of a

claim, excluding intent element); *Youngblood v. Jefferson County Div. of Family & Children*,

838 N.E.2d 1164, 1169–1170 (Ind. Ct. App. 2005); *Wells v. Stone City Bank,* 691 N.E.2d 1246,

1250 (Ind. Ct. App. 1998) (likewise).

We therefore DENY the Collier Defendants' motion to dismiss with respect to Count I's allegation of fraud against Michael Collier based on his December 2007 representations to the appraiser.[26]

### 2. Allegations against John Gay

Plaintiff's allegations against John Gay primarily concern the Opinion Letter he sent to Marquette on April 29, 2008. In that letter, Gay represented that he had reviewed the loan documents, including the "Assignment of Contract" between Kankakee and Marquette, and that he had "examined such other documents, made such investigations of fact, and . . . considered such questions of law, as, in my judgment, have been necessary to render this opinion." Pl.'s Ex. 6. He assured Marquette that Kankakee had all necessary authority to enter into the loan documents, that the loan documents were enforceable according to their terms, and that they were subject to "no defenses of any kind." *Id.*

The allegations pertaining to the Opinion Letter plainly satisfy Rule 9(b)'s pleading particularity requirements: Plaintiff has attached the letter containing Gay's precise words to its Amended Complaint, *see* Pl.'s Ex. 6, and Defendants do not dispute the letter's authenticity. In urging that the letter does not give rise to a fraud claim, the Lee Defendants argue that, read strictly, the letter contains "no misrepresentations whatsoever concerning the Cayman Property or the Option." Lee Defendants' Br. 15–16. While it is true that the letter does not mention either

---

[26] The Amended Complaint contains several other, less specific allegations that Collier engaged in actionable misrepresentations. These include that he repeatedly told Christopherson that the Option had not yet be exercised, and that he forwarded the Land Contract to Ruthy Large knowing that it contained material misrepresentations and omissions. Am. Compl. ¶¶ 47, 75, 81. Plaintiff also alleges that Collier made misrepresentations to Youngevity, the contract buyer of the Kankakee property. *Id.* at ¶ 133. The allegations relating to Collier's further statements to Christopherson fail to satisfy the particularity requirements of Rule 9(b), in that they do not specify the time or manner of the alleged misrepresentations. *Cf. Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012). The allegations that he forwarded a document to Large or lied to Youngevity fail to state a claim for fraud, in that they fail to allege an actual material misrepresentation or detrimental reliance by Marquette, respectively.

by name, it testifies to the validity and enforceability of the "loan documents"—a term defined by the loan agreement itself to include Kankakee's assignment of the Land Contract to Marquette. *See* Pl.'s Ex. 1 at ¶ 4. The assignment document, in turn, specifically refers to the Land Contract and its purported Cayman Islands Option down payment. Pl.'s Ex. 18, at ¶¶ C, D, 1, 4. In the assignment, Kankakee stated that it "hereby assigns, transfers, pledges, sets over and grants a security interest to Secured Party, in and to all of Borrower's [Kankakee's] right, title and interest in the Land Sale Contract." *Id.* at ¶ 1. In representing to Marquette that this assignment was valid, and that Kankakee had the necessary authority to enter into it, Plaintiff has plausibly alleged that Gay made a misrepresentation of fact.

Plaintiff has adequately pled the remaining elements of a fraud claim as well. As counsel for the Lee Group as well as Kankakee, Plaintiff alleges that Gay was fully aware of the true disposition of the Option—and thus of the material falsity of his opinion letter in that respect. Am. Compl. ¶ 67. Although the loan had already been preliminarily approved by April 2008, Plaintiff alleges that Marquette relied upon the opinion letter—the receipt of which was a condition of the loan's approval—in continuing to perform under the agreement. *Id.* at ¶ 68. And as before, Plaintiff asserts that its funding of the loan caused it dire financial consequences resulting from Kankakee's default and Lee's alleged conversion of the Option which was supposed to have been loan collateral. ¶¶ 240, 247–248.[27]

Gay's status as Lester Lee's lawyer places him in a unique position relative to the other Defendants in this action—in that his fiduciary duties did not necessarily begin and end with his responsibilities to his employer. Regardless of whether he owed Marquette any affirmative duty of disclosure, however, his attorney-client relationship does not shield him from liability for any

---

[27] Although the Amended Complaints contains other, less specific allegations of misrepresentations made by Gay, Plaintiff prudently argues only that the April 29, 2008 opinion letter satisfies the requirements of actual fraud.

actual fraud he may have committed while acting in service of his client. *See generally Wright v. Pennamped,* 657 N.E.2d 1223 (Ind. Ct. App. 1995). We therefore DENY the Lee Defendants' motion to dismiss with respect to Count I's allegation of fraud against John Gay based on his April 2008 opinion letter to Marquette.

### 3. Allegations against Ruthy Large

Most of Plaintiff's allegations against Ruthy Large do not actually describe "representations" made to Marquette. Plaintiff alleges that, in carrying out her job, she played a role in delivering the land contract assignment and other documents to Marquette, knowing that the Option had not in fact been delivered to Kankakee as a down payment as the land contract stated. But unlike Collier and Gay, Large is not alleged to have made any statements of past or existing fact herself. Am. Compl. ¶¶ 39, 57, 164–165, 189–190, 220–221. Similarly, the allegation that she "was working with Lester Lee to convert to his personal benefit the funds from the sale of the Cayman Islands Property," *id.* at ¶ 110, in addition to being conclusory, says nothing about a statement to Marquette.

The only communication between Large and Marquette that Plaintiff alleges with any specificity was an email exchange between her and Marquette officer Christopherson. In April 2008, Large inadvertently forwarded Christopherson an email from an account officer at the Cayman National Bank—Plaintiff apparently means to assert that this email concerned the Caymans property described in the Option, though the Amended Complaint does not explicitly say so. Am. Compl. ¶ 114. Christopherson replied, "Did you mean to send this to me?" *Id.* at ¶ 115. Minutes later, Large responded: "Oooppps [sic] no please disregard, I'm not sure how it happened or what it was, but by the subject it is not pertaining to this deal." *Id.* at ¶ 116. It is not clear what importance Plaintiff attaches to this email exchange—or what importance it thinks

Christopherson attached to it. Regardless, Plaintiff never alleges that Marquette relied to its detriment on these enigmatic few sentences, and Plaintiff has therefore failed to plead a fraud claim arising from the emails.[28]

The Lee Defendants' motion to dismiss Count I with respect to Ruthy Large is therefore GRANTED.

## II.    Count II

Count II seeks equitable recovery for the unjust enrichment Plaintiff has allegedly conferred upon all Defendants. Also referred to as *quantum meruit* or quasi-contract, unjust enrichment requires a party who has been unjustly enriched at another's expense to make restitution to the aggrieved party. *Reed v. Reid,* 980 N.E.2d 277, 296 (Ind. 2012) (citing *Bayh v. Sonnenburg,* 573 N.E.2d 398, 408 (Ind. 1991)).  "To recover under an unjust enrichment claim, a plaintiff must generally show that he rendered a benefit to the defendant at the defendant's express or implied request, that the plaintiff expected payment from the defendant, and that allowing the defendant to retain the benefit without restitution would be unjust." *Id. See also Woodruff v. Ind. Family & Soc. Servs. Admin.*, 964 N.E.2d 784, 791 (Ind. 2012).[29]

---

[28] The Amended Complaint states only that "Mikal Christopherson had no other information that suggested Ruthy Large was lying, and he had no reason not to trust her." Am. Compl. ¶ 116.

[29] The Lee Defendants argue in a footnote that the unjust enrichment claims are barred by Indiana's applicable six-year statute of limitations, Ind. Code § 34-11-2-7, since "[a]ny transfers regarding the Option or the Cayman Property occurred no later than March 6, 2008—more than six years before Marquette filed this action in April 2014." Lee Defs.' Br. 28 n.15. But this statute of limitations is subject to the "discovery rule," under which "a cause of action accrues and the statute of limitations begins to run when the plaintiff knew or could have discovered an injury." *King v. Terry,* 805 N.E.2d 397, 400 (Ind. Ct. App. 2004) (citing *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 449 (Ind. Ct. App. 2003)). Here, Marquette alleges that it was unaware that the Option had been transferred to the Lee Group rather than Kankakee—or subsequently re-transferred to Lee and his family members—until after it had sued Lester Lee in Illinois state court in January 2010. Am. Compl. ¶¶ 133, 236. At least for purposes of this motion to dismiss, we therefore cannot say that the statute of limitations bars the claim.

Here, Plaintiff has alleged that the Cayman Islands property Option, which Marquette reasonably believed belonged to Kankakee as the down payment for Youngevity's purchase of the Kankakee motel property, was wrongfully usurped by Lester Lee personally. *See* Pl.'s Exs. 10, 11; Am. Compl. ¶ 119. In January 2009, Plaintiff alleges that Lester Lee then "transferred all of his assets to his wife and children or to entities owned by them." Am. Compl. ¶ 214. Plaintiff has not shown that Michael Collier, John Gay, or Ruthy Large realized any personal financial benefit from this alleged misappropriation; the unjust enrichment claim against them therefore fails. *See* Lee Defs.' Br. 28–29. If Plaintiff's assertions are true, however, then his wife and three daughters—Brenda Lee, Melinda Gabbard, Debra Brown, and Meegan Collier—ultimately received the unjust proceeds derived from the sale of the converted Option. *See Bayh,* 573 N.E.2d at 408.

Defendants protest that Marquette did not grant "any benefit to the Lee Family Defendants with their express or implied request," and they argue that "[t]he absence of any such allegation is fatal to Marquette's unjust enrichment claim." Lee Defs.' Br. 29 (citing *Reed,* 980 N.E.2d at 296). However, as Plaintiff has pointed out in response, recovery is possible against a defendant who was unjustly enriched by a misappropriation, even if the plaintiff did not intend to confer a benefit upon that defendant and that defendant was not personally responsible for the misappropriation.[30] In *Paul v. I.S.I. Services, Inc.*, 726 N.E.2d 318 (Ind. Ct. App. 2000), for instance, the court held that where a husband had embezzled funds from his company and his wife—though innocent of the initial wrongdoing—had benefitted from the proceeds, recovery

---

[30] We recognize that the decisions in *Paul* and *Dominiack* seem to exist in tension with Indiana courts' statements of the general rule that the benefit conferred must be "one that the defendant impliedly or expressly requested." *See Morris v. Crain,* 969 N.E.2d 119, 124 (Ind. Ct. App. 2012); *Coleman v. Coleman,* 949 N.E.2d 860, 867 (Ind. Ct. App. 2011). In light of the fact that valid Indiana case law has allowed recovery against "innocent" parties—without discussing whether they could be said to have "impliedly" requested the benefits in question—we resolve any ambiguity in the precedent in favor of Plaintiff at this stage.

for unjust enrichment was appropriate against her. 726 N.E.2d at 320, 322 ("[T]he trial court heard that embezzled funds were used to make house and car payments, and to pay for vacations by Donald and Judith, their theater tickets, and various household repairs. Such evidence supports the inference that Judith was unjustly enriched by Donald's embezzlement."). *See also Dominiack Mech., Inc. v. Dunbar,* 757 N.E.2d 186, 191 (Ind. Ct. App. 2001).[31]

We therefore GRANT the Lee Defendants' motion to dismiss Count II as to John Gay and Ruthy Large, and DENY the motion as to Debra Brown, Melinda Gabbard, and Brenda Lee. On the same grounds, we GRANT the Collier Defendants' motion to dismiss Count II as to Michael Collier, and DENY the motion as to Meegan Collier.

### Conclusion

We resolve the Defendants' motions to dismiss as follows:

(1) The Lee Defendants' motion to dismiss [Docket No. 27] with respect to Count I is GRANTED as to Defendants Debra Jo Brown, Melinda Gabbard, Brenda R. Lee, and Ruthy Large, and DENIED as to Defendant John Gay. With respect to Count II, the

---

[31] The Collier Defendants also argue that recovery under this theory is precluded because a contract between the parties exists here, and "[w]hen the rights of the parties are controlled by an express contract, recovery cannot be based on a theory implied in law." Collier Defs.' Br. 31, ¶ 49 (citing *Zoeller v. E. Chi. Second Century, Inc.,* 904 N.E.2d 213, 221 (Ind. Ct. App. 2009)). However, as the case law cited by Defendants recognizes, there are significant exceptions to this general principle. Where a contract exists but the defendants in question are not parties to it, as here, unjust enrichment recovery may still be appropriate. *See Zoeller,* 904 N.E.2d at 221 ("There was an express contract in this transaction, but it was not one to which the Attorney General or the State were parties. . . . That transaction is thus not a bar to the Attorney General's claim for unjust enrichment, an equitable remedy."). Moreover, "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Copolillo v. Cort,* 947 N.E.2d 994, 998 (Ind. Ct. App. 2011) (citations omitted). The Defendants alleged to have been unjustly enriched here were not parties to the loan agreement, and the wrong alleged was in fraudulent inducement of the contract rather than its breach. Under these circumstances, we do not find that the existence of the loan precludes recovery on an unjust enrichment theory as a matter of law.

motion is GRANTED as to Defendants John Gay and Ruthy Large, and DENIED as to Defendants Debra Jo Brown, Melinda Gabbard, and Brenda Lee.

(2) The Collier Defendants' motion to dismiss [Docket No. 29] with respect to Count I is GRANTED as to Meegan Collier and DENIED as to Michael Collier. With respect to Count II, the motion is GRANTED as to Michael Collier, and DENIED as to Meegan Collier.

Remaining before us are Count I's claim for fraud against Michael Collier and John Gay, and Count II's claim for unjust enrichment against Debra Jo Brown, Melinda Gabbard, Brenda R. Lee, and Meegan Collier.

IT IS SO ORDERED.

Date: _____03/31/2015_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:


W. Bruce DelValle
DELVALLE LAW GROUP, PA
brucedlg@earthlink.net

Emily C. Lamb
WYATT TARRANT & COMBS -- Lousiville
elamb@wyattfirm.com

Jason Andrew Lopp
WYATT TARRANT COMBS LLP
jlopp@wyattfirm.com

Jean Marie Blanton
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
jblanton@zsws.com

Nick J. Cirignano
ZIEMER STAYMAN WEITZEL & SHOULDERS, LLP
ncirignano@zsws.com